## THE CURLEW.

### BOWRING et al. v. NINE THOUSAND BUNCHES OF BANANAS.

*(District Court, D. Maryland. July 8, 1892.)*

CHARTER PARTY—LIABILITY OF OWNER—BREAKAGE OF MACHINERY.

    Under a charter party by which a steamer was let for the fruit trade the owners stipulated to maintain the steamer's machinery in a thoroughly efficient condition for the service, accidents excepted. *Held*, upon the proof, that the breaking of the junk ring of the high-pressure cylinder was an accident not attributable to defects in the machinery, or want of efficiency, and that the owners of the steamer were not liable for damage to a cargo of fruit caused by delay in the voyage resulting from the accident.

In Admiralty.

*Robert H. Smith* and *John H. Thomas*, for Henry Bros. & Co. and the cargo of bananas.

*Blackiston & Blackiston*, for Bowring & Archibald and the Curlew.

MORRIS, District Judge. These are cross libels arising out of a claim by Bowring & Archibald, owners of the steamer Curlew, for the hire of the steamer, and a claim by Henry Bros. & Co., who were the charterers, for damage to a cargo of bananas, which they allege was caused by the failure of the owners to maintain the steamer in a thoroughly efficient state in hull and machinery, as stipulated in the charter party.

The steamer was let by the owners to H. Dumois & Co., of New York, for the fruit trade, by a charter party, dated March 23, 1889, for the period of one year, with an option of three months longer. Henry Bros. & Co. were interested with H. Dumois & Co. in that charter, and before the expiration of the year the steamer passed exclusively into the possession of Henry Bros. & Co., and the owners dealt with them as the persons for whose benefit the charter party was in force, and rendered them bills for the hire. On July 21, 1890, by a second charter party, the steamer was let by the owners directly to Henry Bros. & Co. for another period to commence at the expiration of the first charter party, and to continue until January 1, 1891. The steamer was employed by the charterers in importing fruit from the West Indies, chiefly bananas; and the voyage on which the damage complained of happened commenced in Baltimore on June 24, 1890, and ended on the arrival of the steamer in Baltimore on July 14, 1890. The bananas had been ordered by the charterers to be cut and ready at Jamaica to be put on board the steamer on July 2d, upon the expectation that she would arrive there on July 1st, and on the next day be ready to receive her

cargo. On the voyage out the steamer had a breakdown in her machinery which delayed her arrival until July 2d, and then she consumed 36 hours in making repairs, so that she did not begin taking on cargo until the evening of July 4th. She finished loading on the 6th, and, making about an average voyage home, arrived in Baltimore on the 14th.

The damage to the cargo is attributable to the over-ripening of the fruit in Jamaica after having been cut, and while lying at the loading places from the 2d to the 6th July. The accident to the machinery which caused this delay was the breaking of the junk ring or follower of the piston in the high-pressure cylinder, which happened at sea on the morning of July 1st. It took about 2½ hours to disconnect the high-pressure cylinder, and the steamer was then run with the low-pressure engine only until she reached her destination, in Montego bay. It had happened also that on this voyage, on June 27th, she broke the rod of her circulating pump, and was stopped two hours while putting in another rod; and on the voyage home, on July 8th, the eccentric strap gave way and she stopped an hour and 35 minutes to repair it. The junk ring is inside the cylinder, and the testimony shows that there is properly no strain or wear upon it, and that its breaking, which now and then will happen, results from such very obscure causes that it is usually considered pure accident. This cylinder had been opened and examined about six weeks before the accident, and found in good condition, and nothing was shown by the broken pieces of the junk ring which indicated any flaw or defect in the iron. It has been attempted to be shown that proper care requires that the cylinder should be opened and its interior examined more frequently than once in six weeks, but the testimony on this point discloses a great diversity of practice among competent engineers; some considering once in six months often enough; others considering that it should be done at the end of every voyage. The preponderance of proof is that once in six weeks on a steamer of this class is considered proper care by competent engineers and is sanctioned by the usage of careful men.

The delay which caused the over-ripening of the bananas and the pecuniary loss sued for by the charterers was the result of the breaking of the junk ring, and the other small breakages are to be considered only as tending to support the allegations of a general neglect to maintain the steamer's machinery in an efficient condition for the service for which the steamer was hired. The charterers' case rests very largely upon statements alleged to have been made by the engineer of the steamer to Samuel Henry and Joseph Henry and Mr. Laubheimer, their clerk. In these conversations he is reported to have said that the steamer's machinery was in need of a general overhauling, and that the owners were so niggardly in repairs that he was unwilling to remain in the steamer unless her machinery was put in better order, and that he was thinking of leaving the ship. Samuel Henry testifies:

"He told me that she was breaking down, and the owners would not spend a cent, and that he had a great deal of difficulty with his engines on the previous voyage, and said, 'I am not going to risk my life on her at all.'"

Samuel Henry testifies that this conversation took place while the steamer was in Baltimore, just previous to the voyage in which the loss occurred. The engineer states that what he was complaining of was the boilers, and the leaking of some of the tubes, and that his grievance was that the charterers did not allow the steamer sufficient time in port between voyages for him to get the boilers properly cooled, and get into them to stop some leaks in the tubes, but that just before the voyage in question, by having boiler makers aboard, and working into Sunday, he had the leaks stopped, and so reported to the owners' general supervising engineer. Undoubtedly it does appear that the steamer's engineer was in the habit of indulging in very loose talk and complaints when he was ashore in Baltimore, and that he was in an ill humor about his being kept so constantly at sea and away from his family, but it seems impossible that the Henrys or Mr. Laubheimer took what he said seriously at the time, or believed that his complaints about the machinery —whatever they were—were a matter of moment. They never reported anything he said to the owners in New York, with whom they were in constant correspondence about different matters connected with the vessel, or to their cocharterers, or to the general supervising engineer of the owners, who came frequently from New York to Baltimore to inspect the steamer. They knew also that the owners had authorized a firm of machinists in Baltimore to do on the steamer whatever repairs her machinery required, and it is a fact that this firm sent a man aboard the steamer whenever she arrived in Baltimore, and as soon as she was at the wharf, to inquire if there was any work to be done, and to arrange for its being promptly attended to.

All that the charterers did in consequence of the engineer's complaints —and it would seem not so much because of them as because on her previous voyage the steamer had to have some repairs done on her circulating pump while at Montego bay—was to ask the master whether the steamer's machinery was in good order, and he replied that it was, and they then told him that they would order the fruit to be cut in advance, as they had special reasons for wanting the cargo as quickly as they could get it, and he said he did not doubt the steamer would make her usual run. Upon this the charterers ordered the fruit cut for the earliest day the steamer could be expected to take it. This was a very unusual thing for them to do, it being their almost invariable custom to engage the fruit in advance, but not to have it cut and brought to the loading places until after the steamer arrived out and reported ready for loading. The owner's supervising engineer, who lived in New York, testifies that his instructions from the owners were to visit Baltimore regularly and examine the steamer's machinery, and that he did so about every second voyage, and had examined her machinery carefully in May, 1890,—being two voyages previous to the one in question. That it was his aim to keep her machinery in the best condition, and that he gave orders to the firm of Baltimore machinists to send some one on board every time the steamer came into port, to take orders from the master or engineer for whatever was required. This testimony of the supervising engineer of his general

practice would not overcome direct proof of neglect, but it is very persuasive that the owners did not intend to fail in keeping the machinery in efficient repair, and that they took proper precaution to have it inspected and promptly attended to; and it does serve to rebut the contention that the owners were unwilling that proper repairs should be done. It further appears from the testimony of the supervising engineer that new boilers were put in in 1887. It appears also that the steamer's engineer was required to report to the supervising engineer, when starting on a voyage, the condition of the machinery, and what repairs, if any, had been made, and the steamer's engineer sent the following report on this voyage:

"CAPE HENRY, June 25, 1890.

"*J. Whitton, Esq.*—DEAR SIR: We left Baltimore on the afternoon of the 24th, and after a run down the bay I find the boiler tight, and everything working well. I kept the boiler makers at work up to Sunday morning."

Although in the charter party the owners stipulated to maintain the machinery in a thoroughly efficient state, accidents of the seas, machinery, and boilers were excepted, and the proof leads to the conclusion that the breaking of the junk ring, which was the sole cause of the delay which damaged the fruit in this case, was an accident, and not the result of the cylinder not being maintained in a thoroughly efficient condition. It is a fact that, although on the arrival of the steamer in Baltimore, on July 14th, whatever damage had been suffered by the fruit was plainly observable and the cause of the delay on the voyage was well known, no notice was sent to the owners of the steamer, or protest entered, and they were afforded no opportunity of sending to Baltimore to have the matter investigated, and obtain direct knowledge of the condition of the fruit. The charterers do not appear to have mentioned it to the master. They spoke of the over-ripe condition of the cargo in an indirect manner in a letter to the brokers in New York, who negotiated the charter, but the first direct notice of such a claim for loss was in a letter to the owners dated August 5th. To this letter the owners at once answered that they should have had earlier notice of such a claim, so as to have had some means of verifying it. The damage to the high-pressure cylinder by breaking the junk ring was repaired, and on the 21st July, 1890,—only a week after the damaged cargo was received by the charterers,—they entered into a new charter with the owners of the steamer for an additional period up to January 1, 1891, which indicates quite clearly that the charterers, notwithstanding what they heard from the engineer, and notwithstanding the result of this voyage, did not themselves believe that the owners were disposed to involve them in losses by being negligent in doing from time to time whatever was required to maintain the steamer's machinery in an efficient state. Indeed, the charterers' letters on the subject of the loss indicate that they thought the delay which resulted in the loss was the result of an accident, although they contended that under the circumstances the owners ought to some extent share the consequences of it, and the charterers continued to employ the steamer in their fruit business until their failure, in October, 1890.

My consideration of the whole case brings me to the conclusion that the breakage of the junk ring was an accident not attributable to the failure of the owners to maintain the efficiency of the machinery, and that they are entitled to recover the hire of the steamer without deduction for the damage to the cargo.